**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

KEVIN ROLLAG,                                      :
                                                   :        Civil Action No.:
                            Plaintiff,             :
                                                   :
              v.                                   :        **COMPLAINT**
                                                   :
COWEN INC., COWEN AND COMPANY, LLC,                :
GAVIN O'REILLY and SCOTT LEMONE, in                :        **Jury Trial Demanded**
their individual and professional capacities,      :
                                                   :
                            Defendants.            :
------------------------------------------------------------X

Plaintiff Kevin Rollag ("Plaintiff"), by and through his attorneys, Wigdor LLP, as and for

his complaint against Defendant Cowen Inc., Defendant Cowen and Company, LLC, (together,

"Cowen" or the "Bank"), Defendant Gavin O'Reilly and Defendant Scott Lemone (collectively

the "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      When Kevin Rollag, a former Director at Cowen, discovered that the new

potential investor on a deal he was working on was Vitaly Malkin, a Russian/Israeli oligarch

banned from Canada for 19 years, and reputed to be engaged in money laundering and arms

dealing (among other ventures), he did not think the Bank could seriously consider allowing his

participation.

2.      Mr. Rollag promptly and dutifully made his objections to the Bank accepting

investment funds from Mr. Malkin's corporate entity, Belleville Management ("Belleville"),

known to his supervisor, Gavin O'Reilly, citing both the legal and reputational risks to Cowen

and their client of becoming embroiled with funds that very possibly could be connected to

money laundering and other fraudulent activity.

3.      Unfortunately, the senior management of Cowen's Cannabis investment banking team, to which Mr. Rollag was assigned, hungered for short-term gain, and rejected Mr. Rollag's sober assessment of the readily apparent and imminent legal risks posed by taking on such a business partner.

4.      Mr. O'Reilly and other managers close to the Cannabis group quickly adopted a harsh stance towards Mr. Rollag, who previously had been universally recognized for his excellent skills and effectiveness as a banker.  Within a month of his first verbal complaints about Belleville and Mr. Malkin in November or December 2019, Mr. Rollag was subjected to a pointedly critical performance review meeting (which contrasted with the actual contents of his 2019 review, as well as his previous year's review).

5.      Weeks after Mr. Rollag first put in writing that he needed to discuss Belleville/Malkin with Mr. O'Reilly in January 2020, he received a bonus slashed by $75,000 and was abruptly reassigned to a supervisor in the Consumer group, and he was no longer considered to be within the Cannabis team (despite the fact that his work primarily still came from that more lucrative team).

6.      Mr. Rollag's well-founded concerns were validated, first by an anti-money-laundering ("AML") report that displayed red flags regarding the prospective investor, and then by a disastrous, last-minute incident in which Belleville's attempt to wire the investment funds went awry due to a supposed phishing scam which directed the funds to a bank account in Mexico (rather than to the Bank of Montreal).  This absurd turn of events nearly destroyed the Cowen client's financing round and required the Bank to scramble to save the deal, including having the Bank take its fees fully in equity rather than cash, as had been provided under the engagement letter with the client.

7.     Against this chaotic backdrop, the rising COVID-19 crisis, and amid the retaliation and pressure to which he was already being subjected by Cowen's management, in early March 2020 Mr. Rollag's wife gave birth to their first child a month early in an emergency delivery.

8.     Mr. O'Reilly was further incensed by Mr. Rollag's paternity leave, and told Mr. Rollag that he would have to work even during his brief, two-week leave, and that he somehow should have planned better for his the unexpected timing of the birth.

9.     Mr. Rollag's "leave" turned into a seemingly non-stop series of phone and video calls and assignments, with perhaps a couple of days of uninterrupted time with his wife and new son.

10.     Just over a week after Mr. Rollag had returned from his leave on March 31, 2020 (at which point the team was all working from home), Mr. O'Reilly engaged in an unprovoked, profanity-laden tirade towards Mr. Rollag in the middle of a team video call during which he also threw an object and/or pounded his desk.

11.     Mr. Rollag sought help from the Bank's management and Human Resources department after this extraordinary display of animus by Mr. O'Reilly, and forthrightly expressed his belief that Mr. O'Reilly was targeting him both due to his open opposition to the Belleville investment (which the Cannabis group's management somehow saw fit to keep pursuing even after the phishing incident), as well as because of his recent paternity leave.

12.     Rather than investigate or do anything else to address these legitimate concerns (Mr. O'Reilly's anger and animus were on open display for everyone on the call), Cowen did nothing, and indeed even made laughable comparisons between Mr. O'Reilly's conduct and criticisms of Mr. Rollag by junior employees who thought he could be stern at times.

13.     The retaliatory pattern of conduct continued, with Mr. Rollag keeping busy in April and May 2020 on existing deals, but receiving no new assignments from management (and even being removed from one) until his summary termination on or around June 4, 2020.

## NATURE OF ACTION

14.     The unlawful discrimination and retaliation described herein was committed in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL") and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq*. ("NYCHRL").

15.     Plaintiff also plans to file and add to this complaint and action claims to recover damages arising from Defendants' unlawful retaliation against him for protected whistleblower activities in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (the "Sarbanes-Oxley Act").

## ADMINISTRATIVE PREREQUISITES

1.     Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA") on July 6, 2020, and intends to file an Amended Complaint alleging violations of Section 806 of the Sarbanes-Oxley Act following the OSHA's completion of its investigation and/or the expiration of the requisite 180-day investigation period.

2.     Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

3.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA. The Court will have further subject matter jurisdiction in this case pursuant to Plaintiff's claims against Defendants under the Sarbanes-Oxley Act.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

16.      Plaintiff Kevin Rollag is the former Director of Investment Banking at Defendant Cowen and Company, LLC.  At all relevant times, Plaintiff was an "employee" under the Sarbanes-Oxley Act.  Throughout his employment at Cowen, Mr. Rollag engaged in work in New York, New York.

17.      Defendant Cowen Inc. is a Delaware corporation, and Defendant Cowen and Company, LLC is a Delaware foreign limited liability company.  Both entities have their principal place of business at 599 Lexington Avenue, New York, New York 10022.  At all relevant times, Cowen was an "employer" under the Sarbanes-Oxley Act.  Cowen has employees and business operations in New York.

18.      Defendant Gavin O'Reilly is a California resident and a Managing Director at Cowen.  At all relevant times, Gavin O'Reilly supervised the employment of Plaintiff and, accordingly, and was an "employer" under the Sarbanes-Oxley Act.

19.     Defendant Scott Lemone is a Massachusetts resident and a Managing Director at Cowen.  At all relevant times, Scott Lemone supervised the employment of Plaintiff and, accordingly, was an "employer" under the Sarbanes-Oxley Act.

**FACTUAL ALLEGATIONS**

I.     **MR. ROLLAG'S WORK AT COWEN AND PROFESSIONAL BACKGROUND**

20.     Mr. Rollag began working for Cowen in the Mergers & Acquisitions ("M&A") group as a Vice President in May 2018.

21.     Before coming to Cowen, Mr. Rollag spent over eight years working at JPMorgan, which he joined out of business school and where he worked in the M&A group on major buy-side and sell-side transactions, as well as leveraged buyouts and initial public offerings.

22.     Mr. Rollag rose from Associate to Executive Director at JPMorgan, and gained experience on successful transactions worth more than approximately $150 billion.

23.     During the recruitment process with Cowen, Mr. Rollag disclosed that he had left JPMorgan after a transfer to/offer of a position in which he was not interested, after which the position he had was eliminated.

24.     Mr. Rollag was hired to help build up Cowen's M&A capabilities, given his experience in the area, including on large-cap, public transactions.

25.     In recognition of his performance at Cowen, Mr. Rollag was promoted to Director after just eight months at the Bank.

26.     Mr. Rollag's 2018 performance review noted his "exemplary relationship skills," that he had "fostered tremendous improvement in teamwork between groups," that he "actively teaches and develops junior team members" and that he "[t]akes true ownership of deals."

27.     His area for improvement on that 2018 review was, in sum and substance, that he works too hard, stating that he "can be prone to overextend himself," which was acknowledged as something that should and would be addressed by the Bank hiring a new Vice President in New York.

28.     In addition, Mr. Rollag was one of two employees at the Vice President level firm-wide in early 2019 whose efforts with his colleagues were recognized with a $5,000 culture-carrier bonus.

29.     In March 2019, after Mr. Rollag had done an excellent job executing two Cannabis M&A transactions (the first two that the Bank had executed to that point), he was tapped to join and help build the growing Cannabis Investment Banking team, which was recognized as a major growth sector for Cowen.

30.     The ambition was to build Wall Street's premier practice in the Cannabis space. Mr. Rollag was specifically told that he would be reporting to Defendant Gavin O'Reilly, the Cannabis group head, and that he was not reporting to Defendant Scott Lemone (Consumer group head).

31.     In fact, Mr. Rollag asked for this assurance on his reporting relationship before he agreed to leave the M&A group.

32.     From April through December 2019, Mr. Rollag demonstrated his nature as a team player and someone who takes charge of his deals.

33.     He assumed responsibility for the Cannabis team's lesser-quality deals (those with lower revenue opportunities and/or a higher degree of deal uncertainty), and devoted himself to efficiently executing those transactions.

34.     Mr. Rollag's work freed up the rest of the team (including Mr. O'Reilly, on whose behalf Mr. Rollag traveled extensively) to work and focus on the larger, higher-quality deals, and contributed to the team's tremendous success and number of deals executed during this period, when the Cannabis team became one of the most, if not the most, successful team in the division.

35.     Unfortunately, despite Mr. Rollag's hard work and demonstrated skills as a banker, Mr. O'Reilly's attitude towards him changed markedly in late 2019, when Mr. Rollag began to speak out about what he viewed as the improper inclusion of an investor that was engaged in unlawful activity (or, at a minimum, strongly suspected to be) in a financing round for a client, which exposed the Bank and its client to legal violations should the investor's participation continue.

36.     Despite Mr. Rollag's objections and concerns, Mr. O'Reilly persisted in working to ensure the participation of this investor, and abruptly turned on Mr. Rollag, including, but not limited to, marginalizing and eventually sidelining him almost entirely from the team's work.

37.     Mr. Rollag's integrity and loyalty to the Bank (rather than perhaps what could have been viewed as his own short-term self-interest) led Cowen's management to retaliate against him in an effort to silence him and, when that did not work and the investor eventually was dropped, ultimately fired him on the thin pretext of a layoff from the Consumer group (although at the time of his termination he was still doing the bulk of his work for the hugely successful Cannabis team).

## II.   MR. ROLLAG OBJECTS TO THE INCLUSION IN A FINANCING ROUND OF AN INVESTOR WITH A RECORD OF SUSPECTED ILLEGAL ACTIVITY

38.   In or around September 2019, Cowen was engaged by Clever Leaves (a large-scale cultivator and processor of medical marijuana formerly known as Northern Swan) to serve as its agent to arrange their Series E capital raise and funding round.

39.   In November and/or December 2019, Belleville was introduced as a potential investor in the Series E funding round for Clever Leaves.

40.   Mr. Rollag promptly did a web search regarding this new investor, and quickly determined that Belleville was the personal investment vehicle of Mr. Malkin.

41.   Mr. Malkin's Wikipedia page (https://en.wikipedia.org/wiki/Vitaly_Malkin), along with many other publicly available sources, describes him as "a Russian-Israeli business oligarch" who had to resign from his office representing a Siberian region in the Federation Council (the equivalent of the Russian Senate), has lobbied in the U.S. against the Magnitsky Act and is strongly suspected (by the Canadian government, among others) to have ties to organized crime, to engage in money laundering, arms dealing, and trade in Angolan conflict diamonds.

42.   After these revelations, Mr. Rollag immediately called Mr. O'Reilly to tell him about the information and the risks posed (both in legal and business terms, including money laundering and fraud, on top of tremendous reputational risk for the Bank).  However, Mr. O'Reilly directed that they would continue to engage Belleville in discussions, and that Mr. Rollag should set aside any possible AML or reputation-related concerns.

43.   Belleville continued to be engaged as part of the round, and was granted access to Clever Leaves' diligence materials, management, and permitted site visits to the client's facilities in Colombia.

44.     Mr. Rollag felt it necessary to raise his concerns to Mr. O'Reilly in writing in order to emphasize the strength of his concerns and get them on record.  On January 17, 2020, Mr. Rollag sent a text to Mr. O'Reilly asking to talk with him about Belleville.

45.     On January 22, 2020, Mr. Rollag also wrote to Mr. O'Reilly via email, stating "Cursory search of Vitaly Malkin raises potential issues we should discuss live."

46.     When Mr. O'Reilly eventually called Mr. Rollag, Mr. Rollag reminded him about his concerns regarding Belleville and Mr. Malkin.

47.     In response, Mr. O'Reilly ordered Mr. Rollag to continue working on engaging Belleville, and to set aside any AML or reputational concerns or considerations.

48.     During his discussions with Mr. O'Reilly, Mr. Rollag had specifically raised concerns about Cowen and Clever Leaves becoming embroiled with money laundering and other fraudulent activities by virtue of a relationship with and accepting funding from Belleville and its affiliates.

49.     Mr. Rollag pressed on, and on February 4, 2020 sent Mr. O'Reilly a text message, again asking him to discuss Belleville.

50.     Mr. O'Reilly later wrote to Mr. Rollag regarding Belleville: "You leading Belleville? We are on[.] Please drive all the follow up there. Good to see them sliding up in size."

51.     When they talked, Mr. Rollag again reminded Mr. O'Reilly about his serious concerns, and Mr. O'Reilly again ordered Mr. Rollag to continue despite those concerns regarding unlawful activity and risk to Clever Leaves and Cowen itself.

52.     Later in February 2020, the management of Clever Leaves asked for Cowen's guidance on how and whether to proceed with Belleville, as they, too, had become aware of issues and concerns surrounding Mr. Malkin.

53.     Mr. O'Reilly agreed to run checks of all of Belleville's associated entities and persons through the Bank's internal AML/compliance vetting process, and to provide the results to Clever Leaves (though simply allowing those results to speak for themselves with the client).

54.     On February 18, 2020, in-house attorney Bradley Friedman, in an email, noted that the Bank did have at least two obligations in the situation: "We need to know who we're selling to (sic) make sure they're not criminals, etc.," and to determine whether or not the client (Clever Leaves) itself would be able to make a determination on whether or not to do business with Belleville, or whether they would need Cowen's help in making that decision.

55.     Mr. Friedman specifically agreed that concerns regarding Mr. Malkin appeared warranted.

56.     Mr. Rollag, writing on a relevant email chain, told Cowen's primary contact at Belleville, Pablo Axelrad, that the Bank would need Background Check and Investor Suitability forms from every beneficial owner, including Mr. Malkin himself.

57.     Troublingly, rather than providing these forms, Mr. Axelrad talked with the Equity Capital Markets ("ECM") team members in an attempt to have the checks run on Audrey Holdings Group (which is not publically linked to Mr. Malkin), rather than on Belleville.

58.     This type of resistance to checks and shifting of entities on which an investor or client wants checks to be run (absent another clear explanation) are prime red flags for legal and compliance concerns pursuant to "Know Your Customer" (KYC) requirements and other federal laws and Securities Exchange Commission rules and regulations.

59.     Days later, on February 21, 2020, Belleville made it known that it intended to raise its proposed investment with Clever Leaves to $5 million from the less than $1 million previously discussed.

60.     ECM Vice President Andrew Trask reported this development to the rest of the deal team via email, to which Managing Director Michael Campbell responded, "OMG."

61.     That same day, Veronica Taylor of AML/Compliance shared their findings, in which both Mr. Malkin and Audrey Holdings Group (the entity that Mr. Axelrad wanted Cowen to vet rather than Belleville) triggered red flags, and which noted that Mr. Malkin is a "politically exposed person."

62.     Despite including the qualifier that the flags were not intended to suggest a conclusion that any entity or person had, in fact, broken the law, Ms. Taylor noted that it was incumbent on Cowen to "perform our own due diligence to ensure it's not tied to anything illegal."

63.     Yet, no further due diligence was to be conducted, and these red flags were disregarded by Mr. O'Reilly.  Indeed, the Bank sent instructions on how to transfer the funding to Mr. Axelrad.

64.     Mr. Rollag, not knowing that, even after this AML report, management would leave Belleville in the deal, was allowed to personally invest in the Clever Leaves transaction on or around February 22, 2020, on the understanding that Belleville at that point was not part of the transaction.  This indicated Mr. Rollag's good standing at the Bank at that time.

65.     Cowen itself, which had already invested money in Clever Leaces in a previous round, also invested in the Series E Clever Leaves capital raise, which further demonstrated why Mr. Rollag believed that participation by Belleville (and Mr. Malkin by proxy) exposed the Bank

to serious legal risk (as well as why the Bank would be doubly motivated to shore up the client's finances).

66.    On March 4, 2020, Mr. Trask (who was Cowen's point person with Belleville) confirmed with Mr. Axelrad that Belleville was confirmed to make its $5 million investment in Clever Leaves, although no diligence that Mr. Rollag knew of had been done.  Mr. Axelrad responded that the transfer would be made the next day pending wire instructions.

67.    Bizarrely, however, the following week Belleville claimed to have been phished and to have supposedly sent its wire with the investment funds to an account at a Mexican bank, rather than the Bank of Montreal, where it was supposed to go.

68.    Absurdly, it was even discovered that one of the emails that the Bank had been communicating with on the deal came up on a Google search as belonging to a person was believed to be (or simply labeled online as) a masseuse located in India.

69.    Due to this highly suspicious and last-minute turn of events, Cowen was put in the compromised position of saving the Series E round by enlisting already-existing investors in Clever Leaves to increase their investment in order to shore up the capital raise and keep Clever Leaves from failing altogether.

70.    Mr. O'Reilly discussed this fraudulent wire situation with Managing Director and Co-President Larry Wieseneck, as well as with Investment Banking Chief Operating Officer ("COO") Rene Kraenzlin and Cowen Chief Executive Officer ("CEO") Jeffrey Solomon.

71.    Mr. O'Reilly and Mr. Campbell made the decision to amend the Bank's engagement letter with Clever Leaves to allow payment of Cowen's banking fees in equity rather than cash, so that Cowen could still post a headline saying that the capital raise totaled $20 million.

72.     Indeed, in the following days, Clever Leaves personnel said they were able to identify communications that showed how the fraudulent transfer took place.

73.     Needless to say, this incident and its consequences obviously should have confirmed and validated Mr. Rollag's multiple objections to Belleville as an investor (not to mention the AML report's warning signs), and called into question the judgment and discretion exercised by the Cannabis team's senior members, including Mr. O'Reilly, who had decided to forge ahead with Belleville despite the risks to Cowen and its client.

74.     On March 16, 2020, Belleville's legal counsel informed Cowen that his client would "have to put the investment on hold," and claimed to have recovered the money from the fraudulent bank account.

75.     The attorney for Belleville also dangled the possibility that Belleville might reconsider its position and make an investment in Clever Leaves at the closing of the Series E round, or in a later financing round.

76.     Incredibly, managers at Cowen continued to discuss how to keep Belleville in the deal, despite the blatant legal and reputational risk factors and objective reasons to question their suitability as an investor (including, but not limited to, their shifting of the entity to be vetted and the suspicious phishing incident).

77.     This step alone demonstrates the Bank's prioritization of short-term gain over compliance and avoiding legal risk, and strongly suggests that a banker's opposition to the investment (such as that of Mr. Rollag) would not have been received well.

78.     Clever Leaves also urged Cowen to keep chasing Belleville for the investment money, and Mr. O'Reilly and Mr. Campbell agreed to do so.

79.     Privately, many of Mr. Rollag's coworkers agreed with his assessment of Belleville as an unsuitable and dangerous potential business partner.

80.     That same day, in a discussion about the status of Belleville, a colleague noted to Mr. Rollag that, "Belleville wants out of deal and is being unsurprisingly sketchy."

81.     No doubt, losing an investor at the last minute is a bitter pill to swallow, but it was the Bank's blithe and hostile disregard for the concerns raised by Mr. Rollag that landed Cowen and its client in that spot.

82.     Mr. Rollag could not believe the Bank was doing this, and throughout March 2020 and beyond, repeatedly expressed to the Bank his concerns that Belleville was not a suitable or trustworthy investor, and that the Bank absolutely should not pursue them any longer, particularly without having seen the results of criminal investigations launched in the wake of the fraudulent transfer.

83.     In response to this eminently sensible viewpoint, Mr. O'Reilly angrily responded to Mr. Rollag, "What do you want me to do?" before abruptly and brusquely ending the conversation.

84.     At or around the end of March, Mr. Rollag documented his concerns in writing, Mr. O'Reilly and others stopped discussing Belleville in front of Mr. Rollag or on electronic communications that he would receive (though Clever Leaves may have continued to discuss it).

85.     Mr. Rollag recognized the difficult position that the Bank was in *vis-à-vis* its client, but he felt compelled to make it clear that Cowen could not pursue Belleville and Mr. Malkin as investors without imminent risk of legal violations and exposure.

86.     Mr. Rollag believed and recognized from the start that this prospective investor posed a palpable risk of involving the Bank and its client in unlawful and fraudulent activities,

including money laundering, any one of which would violate applicable laws against fraud involving securities, banks and wire transfers, as well as various federal rules, regulations and laws to which the Bank is subject.

87.     Mr. Rollag loyally sought to spare the Bank from what he saw as an imminent legal and reputational risk, whereas his managers appeared single-mindedly preoccupied with marginal gain and forcing the deal through by hook or by crook, no matter what willful rationalization and blinders they had to put on in order to make it happen.

88.     Mr. Rollag's objections and opposition were expressed not only to Mr. O'Reilly and others at and above his level, but also to various other coworkers, many of whom agreed with his beliefs and objections.

## III.   DEFENDANTS UNLAWFULLY RETALIATE AGAINST MR. ROLLAG IN HIS COMPENSATION AND POSITION ASSIGNMENT

89.     On or around January 7, 2020, the month after Mr. Rollag first verbally raised serious concerns about Belleville and proposed that Cowen should back off from involving Belleville in the Clever Leaves financing round, he received his 2019 year-end review from Mr. Lemone and Mr. O'Reilly .

90.     Despite the fact that Mr. O'Reilly was and had been Mr. Rollag's direct supervisor, Mr. Lemone acted as the primary reviewer.  Mr. O'Reilly acted as the primary reviewer for the other Director on the Cannabis team.

91.     Mr. Lemone assumed this role despite the fact that Mr. Rollag had not worked with him at any point in 2019.

92.     Mr. Rollag was told that this was not going to happen, and in doing so management was acting contrary to the express agreement reached with him regarding his move

to the Cannabis team, in which he was to report to Mr. O'Reilly as the head of that team and not

to Mr. Lemone.

93.     In this review, Mr. Rollag was criticized for his sometimes firm treatment of

junior employees, which ignored the reality that he was following Mr. O'Reilly's direction, and

that such instances and criticism did not reflect his full relationship with the less-experienced

team members, whom he actively mentored and trained (which also was mentioned multiple

times in the written feedback received in advance of his review).

94.     Overall, however, the review contained a large amount of superlative praise for

Mr. Rollag's knowledge and skills as a banker, including quotes such as:

- "Kevin is a valuable leader and banker driving execution in the cannabis space. He's a strong performer with classic training and background in investment banking.  He's good at training juniors and overall lifting the banking standards."

- "Kevin is an excellent teacher.  He is willing to sit down with junior team members and teach them inner workings and details within a model.  He also is fantastic at execution and organization, I appreciate the processes he has [put] in place [in] order to keep the consumer team operating in lockstep."

- "Kevin is extremely strong from a technical standpoint and does a good job teaching juniors to follow best practices on the job."

- "In terms of execution, practice development and technical mastery, Kevin is brilliant."

95.     Mr. O'Reilly and Mr. Lemone had to concede in the review meeting that Mr.

Rollag was a highly skilled and effective banker, at one point summarizing the written feedback

received by the managers in advance of the meeting to Mr. Rollag as to the effect that, "You

know your shit."

96.     The aggressive tone and negative focus of this January 2020 review meeting for 2019 also was a strange and marked departure from his review for the previous year.

97.     In fact, the occasions during 2019 when Mr. Rollag remonstrated with junior employees generally came after Mr. O'Reilly specifically directed Mr. Rollag to take someone to task or exert more pressure on them.

98.     The Bank had never hired a Vice President to assist Mr. Rollag with his workload, as had been strongly recommended in connection with his review given in early 2019.

99.     In addition, Mr. Rollag was criticized for questioning and talking back to senior managers (which realistically could only refer to Mr. O'Reilly, who was the only senior employee whom Mr. Rollag had worked with and had any difference of opinion with in recent months at Cowen).

100.    This critique in particular boiled down to Mr. Rollag being singled out for making his concerns about the Belleville situation heard, despite the fact that employees generally tend to be praised for communicating their positions strongly and clearly (particularly where risk to the Bank is concerned).

101.    Indeed, it was Mr. O'Reilly, and not Mr. Rollag, who would call junior employees "retarded" and "stupid," and would tell Mr. Rollag to "get on their ass" (including with regard to a few of the individual employees who had said Mr. Rollag could be stern)  and that "you have to assume they're retarded."

102.    Adding to the strangeness and irregularity of this review was the review document's format, which appeared unfinished and as though it had not been officially and/or electronically submitted.

103.     Indeed, to Mr. Rollag's knowledge, the review was never submitted and he was never given a copy of his summary review, as employees were supposed to receive per Bank policy, and as he had been given in early 2019.

104.     By the time of Mr. Rollag's review in January 2020, Mr. O'Reilly had already begun to distance himself and pull back from Mr. Rollag, and later effectively to no longer actively engage as his direct supervisor.

105.     This behavior by Mr. O'Reilly had begun in the wake of Mr. Rollag's opposition to Belleville.

106.     Even still, most of Mr. Rollag's 2019 review was excellent, particularly regarding his technical skills and effectiveness in executing deals.

107.     Mr. Rollag's managers, however, continued to bear down on him, and the retaliation escalated soon thereafter, in early February 2020, after Mr. Rollag had sent written communications to Mr. O'Reilly in mid-January 2020 reiterating the need to discuss his concerns regarding Belleville.

108.     On or around February 4, 2020, Mr. Rollag learned that he would receive a bonus for 2019 that was $75,000 lower than the one he received for 2018, which he was told was in line with reductions made firm-wide for bankers outside the Cannabis team (although Mr. Rollag had worked with the Cannabis team the vast majority of the year, including on execution of its only M&A deals before he officially joined the team).

109.     Mr. Rollag's total compensation for 2019 was $50,000 lower than it was for 2018, despite the fact that his salary for 2019 was $25,000 higher, and that he had received a promotion to Director at the beginning of 2019.

110.    Mr. Lemone also told Mr. Rollag in the February 4, 2020 compensation meeting that he would now be reporting to Mr. Lemone, rather than Mr. O'Reilly (despite the fact that Mr. O'Reilly would continue to hound Mr. Rollag during the last four months of his employment), and that he would now instead be handling M&A duties for all of the Consumer group.  Therefore, within weeks of Mr. Rollag's first written communications substantiating his objections to Belleville, management shifted him from reporting to the head of the Cannabis team to a much more vulnerable and less lucrative position reporting to the head of the Consumer group.

111.    Due to this sudden reshuffling of Mr. Rollag's nominal group assignment (since he was still working exclusively on the Cannabis team's deals), he was excluded from the compensation benefits associated with the record year of profits generated by the Cannabis team (the legacy members of which were Mr. O'Reilly, Michael Cella, Managing Director, and Mr. Campbell).

112.    Mr. Rollag's compensation therefore markedly suffered, despite the acknowledged fact that he played a critical role in the Cannabis team's 2019 results by ensuring that many of its lesser deals stayed afloat, helping more prominent deals to come through.

113.    Soon thereafter, during the week of March 2, 2020, Mr. O'Reilly began a pattern of particularly open, hostile, intimidating and aggressive conduct towards Mr. Rollag – talking down to him, yelling at him, constantly cursing at and insulting him and other unprofessional harassment and bullying conduct.

114.    This treatment continued, despite the fact that around this time Mr. Rollag was well-thought-of enough at the Bank to be invited as part of a select group to attend a gala in honor of Cowen CEO Jeff Solomon.

IV.    **MR. ROLLAG'S WIFE GIVES BIRTH TO THEIR SON, AND DEFENDANTS' RETALIATION CONTINUES AND CULMINATES IN HIS TERMINATION**

115.    Later that week, on March 6, 2020, Mr. Rollag's wife was suddenly and unexpectedly hospitalized with pregnancy complications and gave birth to their son and first child about a month earlier than the expected due date and scheduled C-section.

116.    When Hannah Choy, Executive Assistant, emailed the team and Mr. O'Reilly about Mr. Rollag having to leave the office for the birth, Mr. O'Reilly's reaction was to write, "Holy schnikes…3 weeks early!  Copying Clever Leaves deal team since he is at the center of that project and others will need to ensure everything is getting done there."

117.    Mr. O'Reilly was manifestly angry, aggravated and annoyed that Mr. Rollag would be on leave for any amount of time.  Among other comments, Mr. O'Reilly griped that Mr. Rollag supposedly should have game-planned for his leave better (disregarding the fact that the birth occurred on an emergency basis).

118.    Although Mr. Rollag was entitled to a couple of weeks of paternity leave, he worked remotely for nearly the entire period (the office went into remote work mode in its entirety in any case due to the COVID-19 pandemic just a week after his wife gave birth).

119.    In one email from about one week after the birth of Mr. Rollag's son, Mr. O'Reilly would not respond to communications from Mr. Rollag about an assignment that had been requested from Mr. Rollag, despite the fact that Mr. Rollag had taken the trouble of producing the content during his (nominal) paternity leave.  Mr. Rollag felt compelled to emphasize to Mr. O'Reilly that he was supposed to be on leave in response to this conspicuous discourtesy.

120.     A team player as ever, Mr. Rollag continued working on the Clever Leaves transaction in addition to another deal for the team, despite his supposedly being on paternity leave (he barely had two days of uninterrupted time with his wife and new baby).

121.     During both weeks of his nominal leave, Mr. Rollag was still on most if not virtually all material calls on his deals, which suggested that, if not for the COVID-19 crisis, he likely would have been forced to come back to the office after a week, if not sooner.

122.     On March 31, 2020, less than two weeks after the end of Mr. Rollag's "leave," Mr. O'Reilly's abusive and retaliatory conduct spilled into the open in a public outburst.

123.     On a team Zoom call, after a momentary skip or delay in the audio caused Mr. Rollag to speak concurrently with Mr. O'Reilly, Mr. O'Reilly aggressively yelled at Mr. Rollag not to "fucking interrupt me."

124.     Mr. Rollag forthrightly responded that there was no need for aggressive or "bullying" behavior.

125.     Mr. O'Reilly then screamed at the top of his lungs, "Fuck you, I don't fucking care, don't ever fucking interrupt me!"

126.     Mr. O'Reilly could be heard on the call throwing an object and banging his fists against his desk or keyboard.

127.     Colleagues on the team immediately expressed their shock at Mr. O'Reilly's behavior towards Mr. Rollag, including that he appeared to be a lightning rod and that the team was grateful that Mr. Rollag shielded them from such conduct.

128.     This incident abundantly demonstrates Mr. O'Reilly's animus, hair trigger and belligerent attitude when it came to Mr. Rollag.

129.    Mr. O'Reilly seemed to realize that he had crossed a line and revealed too much of himself, and soon texted a very brief apology to Mr. Rollag.

130.    After this display by Mr. O'Reilly, Mr. Rollag sent an email to Mr. O'Reilly and the ECM Managing Director on the Clever Leaves deal, memorializing his position and concerns regarding Belleville, and noting that he had raised such concerns previously.

131.    Mr. Rollag wrote, in relevant part: "In order to memorialize my sentiments, which I've shared previously, I do not believe it's in Cowen's nor our client's (Clever Leaves) best interest to engage further with Belleville Management SA ("Belleville").  While Belleville passed Cowen's internal review, I am not confident the review was sufficiently thorough. I believe Belleville's role as a purported phishing victim lured into wiring funds to an unknown Mexican bank account merits further investigation. At this time, accepting capital from Belleville may pose a potential reputational risk to both Clever Leaves and Cowen, especially, but not limited to whether Cowen accepts a procurement fee."

132.    The email also went to Mr. Lemone, the head of the Consumer group, and Cowen's COO, Rene Kraenzlin.

133.    Mr. Lemone responded with a flat "Thank you," which is the only response Mr. Rollag received to this message from any of the various executives, despite his invitation for a discussion on the subject (particularly to Mr. Lemone and the COO).

134.    Mr. Rollag had proceeded with his complaints and objections regarding Belleville according to his understanding of Cowen's policies, under which employees should first raise concerns with their direct supervisor, and then escalate to the next supervisory level if necessary.

135.    The Bank's Legal and Compliance departments had already been involved in the assessment of Belleville, and appeared unwilling or unmotivated to act beyond their limited, unforceful actions to that point.

136.    Mr. Rollag also contacted Mr. Lemone separately about Mr. O'Reilly's conduct on the call, and Mr. Lemone said that he would talk with Mr. O'Reilly (while notably failing to offer to loop in Human Resources).

137.    For this reason, Mr. Rollag also contacted Human Resources the next day about the disturbing episode, and sent the representative, Rebecca McAdams, the list of attendees for the March 31, 2020 call.

138.    The Human Resources representative told Mr. Rollag that she would talk with Mr. Lemone about next steps, and Mr. Rollag had a call with the two of them the next day.

139.    Mr. Lemone asked Mr. Rollag not to pursue the matter any further, and said that Mr. O'Reilly recognized that he was wrong.

140.    Unbelievably, Mr. Lemone inappropriately reminded Mr. Rollag that his review included feedback to treat juniors better.

141.    Mr. Lemone did not mention that Mr. Rollag had never screamed "Fuck you" at a junior employee on a team video call.

142.    Given the obvious indifference with which Mr. O'Reilly's conduct towards him was being treated (even having the Bank try to turn the incident around on him), Mr. Rollag felt he had no other choice in the moment but to agree that he would let the incident go and thanked them for their time.

143.     Mr. Rollag expressly told Mr. Lemone and Ms. McAdams that he believed Mr.

O'Reilly was angry at him because of his opposition to Belleville's investment, and made it clear

to Mr. Lemone that he did not trust Belleville.

144.     Mr. Rollag also mentioned a new pattern of behavior and a disrespectful attitude

and approach by Mr. O'Reilly regarding his recent paternity leave.

145.     Among other things, Mr. Rollag noted that Mr. O'Reilly blamed Mr. Rollag for

the need to adjust on the fly to his wife's emergency C-section, which was a month early.  Mr.

O'Reilly had insensitively said to Mr. Rollag during the week after the Friday (March 6, 2020)

when his wife had given birth, "We really should have had a better gameplan for this."

146.     Mr. O'Reilly also had told Mr. Rollag that, despite the birth of his child, he

needed to keep working on active Clever Leaves deals "because of everything that is going on."

147.     Mr. Rollag, however, was determined not to have this retaliation force him out of

his job, and was not deterred from carrying out his responsibilities by Mr. O'Reilly's

unprofessional and increasingly openly retaliatory conduct.

148.     During the weeks after these incidents, Mr. Rollag was not asked to execute nor

market transactions, despite his agreement (as though he had a choice) to work on any M&A

deal that the Cannabis or Consumer groups had, despite the fact that the deals were, in fact, being

marketed and executed at the time.

149.     Mr. Rollag contacted Mr. Lemone about this conspicuous lack of assignments,

and was told that it would be looked into and that Mr. Rollag would hear back.

150.     The Bank did not tap Mr. Rollag to work on any additional deals, even those

currently existing (and he was removed from an active deal that was beginning), nor did he hear

back from Mr. Lemone.

151.    Mr. Rollag checked with Mr. Lemone multiple times on this issue, but was repeatedly put off and told that he would look into it and get back to him, which never happened.

152.    Rather than take any action whatsoever to address Mr. Rollag's legitimate complaints about Mr. O'Reilly, concerns regarding retaliation and bullying or address his serious concerns on Belleville (not limited to the disturbing supposed phishing episode, the switching of Malkin-related entities that the investor wanted Cowen to vet, and the willful blindness of the Cannabis team's management to the obvious legal and reputational risks of courting Belleville and Mr. Malkin), Cowen's management targeted Mr. Rollag for further unlawful retaliation.

153.    Mr. Rollag had been chastised and drew the ire of his managers for pressing his concerns regarding a course of action (following through with Belleville as an investor) that ultimately did, in fact, hurt the team, the Bank, and their client Clever Leaves.

154.    Although Mr. Rollag remained busy into June 2020 with at least four fee-generating matters, Mr. Rollag faced a situation in which he was being excluded from the Cannabis team and, ultimately, seemed to have bleak prospects at the Bank in general due to management's pattern of retaliation.

155.    Management did not give him new opportunities, despite the fact that, upon information and belief, other employees on the Consumer and Cannabis teams continued to be put on deals and get new work opportunities.

156.    Mr. O'Reilly also began to bring other people onto deals that he had been working on with Mr. Rollag, and for the entire month of May 2020, as new work streams came in for Clever Leaves and other clients, Mr. O'Reilly called associates and analysts directly

(though they were direct reports of Mr. Rollag), bypassing Mr. Rollag (who was the primary client-facing employee on those transactions).

157.    On June 4, 2020, in the wake of the blatant retaliatory conduct and animus of Mr. O'Reilly and others, and not even three months removed from the birth of his child (and at most two months after his complaint to Mr. Lemone about his treatment by Mr. O'Reilly during and in the wake of his paternity leave), Cowen summarily terminated Mr. Rollag.

158.    Mr. Rollag was not told that his performance or supposed treatment of junior employees played any part in the decision to terminate his employment.

159.    He was the only employee let go from the Consumer team, and the only employee from the team let go in the several months previous for reasons other than a visa issue or the closing of the Houston office.  The Bank also had recently extended an offer to a new Managing Director candidate from Credit Suisse, undermining any argument that it urgently needed to cut costs in Mr. Rollag's area.

160.    In addition, Mr. Rollag at the time was among the busiest employees working on the Cannabis team and, by that token, in the Consumer group.

161.    The Cannabis team was one of the most, if not the most, profitable groups in the Investment Bank, and Mr. Rollag's recent exclusion from the team by Mr. O'Reilly was transparently intended to help justify his termination.

162.    Conspicuously, and indicative of the Bank's disregard for its employees and workplace, Mr. Rollag, who is of Latinx descent and heritage (a fact that was well-known, and led to him being staffed on nearly all deals involving Latin America), was the only person of color among the Bank's Consumer group, yet he unaccountably was targeted for termination

despite his track record of effectiveness and superior job knowledge (particularly as compared to certain comparators on the team).

163.     In contrast to the criticism that was emphasized in pretextual fashion by Mr. Rollag and Mr. Lemone in January 2020, several junior employees reached out to Mr. Rollag after his termination with sincere regrets, upset and shocked by his dismissal.  Some even noted how abrupt Mr. Rollag's departure was given how busy he remained right up until his termination.

**FIRST CAUSE OF ACTION**
**(Retaliation in Violation of the FMLA)**
***Against All Defendants***

164.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

165.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  Plaintiff, a full-time employee of Cowen, at all relevant times worked at least 1,250 hours in any 12-month period, and specifically, in the 12-month period preceding his termination.

166.     At all times relevant herein, Cowen was a "covered employer" within the meaning of the FMLA.  Cowen employs 50 or more employees in at least 20 calendar weeks within a 75-mile radius of the Bank's headquarters.

167.     By the actions described above, among others, Defendants have retaliated against Mr. Rollag for availing himself of the rights and benefits of the FMLA.

168.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other

economic harm for which he is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses and other relief.

## SECOND CAUSE OF ACTION
### (Unlawful Interference in Violation of the FMLA)
#### *Against All Defendants*

169.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

170.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA, and Cowen was a "covered employer" within the meaning of the FMLA.

171.     By the actions described above, among others, Defendants have unlawfully interfered with Mr. Rollag's right to take FMLA leave and return to work from such leave by unlawfully terminating his employment.

172.     As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which he is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses and other relief.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
#### *Against All Defendants*

173.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

174.     Defendants have discriminated against Plaintiff in violation of the NYSHRL by denying him equal terms and conditions of employment, including, but not limited to, by terminating his employment because of his parental status.

175.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

176.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

177.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
***Against All Defendants***

178.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

179.    Defendants have retaliated against Plaintiff on the basis of his protected activity, in violation of the NYSHRL, by subjecting Plaintiff to adverse actions because he engaged in protected activity, including, *inter alia*, terminating his employment.

180.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well

as compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

181.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

182.    Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**(Aiding and Abetting Violations of the NYSHRL)**
*Against Defendants O'Reilly and Lemone*

183.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

184.    Defendants O'Reilly and Lemone knowingly or recklessly aided and abetted the unlawful employment practices and discrimination against Plaintiff in violation of the NYSHRL.

185.    As a direct and proximate result of Defendant O'Reilly's and Defendant Lemone's unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

186.    As a direct and proximate result of Defendant O'Reilly's and Defendant Lemone's unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

31

187.    Defendant O'Reilly's and Defendant Lemone's unlawful actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
#### *Against All Defendants*

188.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

189.    Defendants have discriminated against Plaintiff on the basis of his parental status in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon his parental status, including, *inter alia*, terminating his employment.

190.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

191.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

192.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

193.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

194.    Defendants have retaliated against Plaintiff in violation of the NYCHRL on the basis of his protected activity by subjecting Plaintiff to adverse actions because he engaged in protected activity, including, *inter alia*, terminating his employment.

195.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

196.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

197.    Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Violations of the NYCHRL)
### *Against Defendants O'Reilly and Lemone*

198.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

199.    Defendants O'Reilly and Lemone knowingly or recklessly aided and abetted the unlawful employment practices and discrimination against Plaintiff in violation of the NYCHRL.

200.    As a direct and proximate result of Defendant O'Reilly's and Defendant Lemone's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, as well as compensation and benefits, for which he is entitled to an award of monetary damages and other relief.

201.    As a direct and proximate result of Defendant O'Reilly's and Defendant Lemone's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

202.    Defendant O'Reilly's and Defendant Lemone's unlawful actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.    An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons

acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority and other benefits of employment;

D.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, as well damage to his reputation, under applicable law;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial;

F.      An award of punitive damages and any applicable penalties and/or liquidated damages, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  July 6, 2020
       New York, New York               Respectfully Submitted,

                                       **WIGDOR LLP**

By: _____
                                 Douglas H. Wigdor
                                 Lawrence M. Pearson

                                 85 Fifth Avenue
                                 New York, NY 10003
                                 Telephone: (212) 257-6800
                                 Facsimile: (212) 257-6845
                                 dwigdor@wigdorlaw.com
                                 lpearson@wigdorlaw.com

                                 *Counsel for Plaintiff*